# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs November 6, 2012

## STATE OF TENNESSEE v. STEPHEN BAKER

**Appeal from the Criminal Court for Putnam County**
**No. 10-0017   Leon Burns, Judge**

---

**No.  M2012-00155-CCA-R3-CD - Filed July 17, 2013**

---

Appellant, Stephen Dewayne Baker, was indicted by the Putnam County Grand Jury in January of 2010 for one count of first degree murder, one count of felony murder, one count of aggravated robbery, one count of arson, and one count of tampering with evidence. Appellant was convicted by a jury of all offenses as charged in the indictment.  At a sentencing hearing, the trial court merged the first degree murder conviction with the felony murder conviction and imposed a life sentence.  Appellant was also ordered to serve twelve years for the aggravated robbery conviction, six years for the arson conviction, and six years for the tampering with evidence conviction.  The trial court ordered the arson and tampering with the evidence convictions to be served concurrently with each other but consecutively to the life sentence and sentence for aggravated robbery, for a total effective sentence of life imprisonment plus eighteen years.  After the denial of a motion for new trial, Appellant initiated this appeal.  On appeal, Appellant contends: (1) the trial court erred by denying a change of venue; (2) the trial court erred by denying Appellant's motion to suppress; (3) the evidence was insufficient to support the convictions; (4) the trial court erred by admitting evidence of Appellant's prior bad acts; (5) the trial court erred in admitting the dying declarations of the victim; (6) the trial court erred in admitting testimony of Harold Harp about Appellant's behavior; and (7) the trial court erred in admitting a photograph of the victim's body.  After a review of the record, we conclude that the trial court: (1) did not err in denying a change of venue where there was no proof that the jury pool was tainted from exposure to information about the incident; (2) did not abuse its discretion in denying the motion to suppress where consent for the search was valid and the search warrant was properly procured; (3) properly admitted evidence of Appellant's drug use and past violent behavior; (4) properly admitted the dying declaration and excited utterances of the victim; (5) properly admitted the testimony of Mr. Harp; and (6) properly admitted photographs of the victim's body. Additionally, we determine that the evidence was sufficient to support the convictions.  Accordingly, the judgments of the trial court are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

Randy Chaffin, Cookeville, Tennessee, for the appellant, Stephen Baker.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Randall A. York, District Attorney General; and Anthony Craighead, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Factual Background*

On January 9, 2010, authorities responded to a report of a trailer fire on Buck Mountain Road in Putnam County, Tennessee. The trailer was a total loss. In the ashes, authorities located the body of Jennifer Smith, the victim.

Tennessee Bureau of Investigation ("TBI") agent Steve Huntley was called to the scene of the fire. As part of the investigation, he was interested in speaking with the neighbors of the victim to ascertain if anyone had any information about the fire. Appellant and Kari Speck lived in a nearby trailer. Agent Huntley knocked on the door but "no one would come to the door." Special Agent Billy Miller tried to call and text the occupants to gain access. "Finally, . . . Ms. Speck [came] to the door and allowed [Agent Huntley and others] to come into the house."

Ms. Speck informed authorities that she and Appellant lived in the trailer. Shortly after the officers entered the residence, Ms. Speck signed a consent-to-search form. Appellant was found and arrested on an unrelated warrant and taken to jail. Ms. Speck spoke with authorities.

The next day, Special Agent Miller asked Appellant for consent to search the home. Appellant denied that there would be anything "involved" with the victim at his home but signed the consent form. The consent form also included "any clothing or evidence pertaining to the death of Jennifer Smith."

Ms. Speck was also arrested on unrelated warrants. On January 11, she signed another consent form. She was asked if there was anything at the home that would be "involved"

with the death of the victim. Ms. Speck again spoke with authorities, admitting that she had lied in her first meeting because she was afraid of Appellant and fearful for her son.

After consent was obtained from both Appellant and Ms. Speck, Special Agent Miller procured a search warrant for the residence. He utilized statements from Ms. Speck in his affidavits for the search warrants but acknowledged that she had been both truthful and untruthful during the investigation. A "pretty thorough search" of the home was completed.

On January 26, Special Agent Miller obtained a search warrant to seize Appellant's clothing, including his boots, from the booking area at the jail.

The results of the search warrants and investigation led to the indictment of Appellant and Ms. Speck in March of 2010 by the Putnam County Grand Jury for first degree murder, felony murder, aggravated robbery, arson, and tampering with the evidence.[1]

Prior to trial, Appellant filed multiple motions in limine, specifically filing several to suppress the results of the search warrant and seizure of his clothing and boots. The trial court denied the motions to suppress.

The case proceeded to trial. Harold Harp testified that two days prior to the fire, Appellant came to his door and asked to use his phone to call "his girlfriend, or wife, or whatever." Mr. Harp lived next door to Appellant and Ms. Speck and two doors down from the victim's trailer. Mr. Harp described Appellant's actions as "weird," explaining that he dialed a number, "stood a minute" and then exclaimed, "she must be mad at me . . . [s]he ain't going to answer the phone." When Appellant got off the phone, he stood there for a minute before turning around and leaving from the trailer.

Debra Schreck, a co-worker of the victim, testified that they were both private-duty nurses for a home healthcare company. She last spoke to the victim at around noon on January 8.

In the afternoon on January 8, 2010, Clinton Staggs, the owner and manager of Bud's Quick Cash Pawn in Cookeville, Tennessee, gave Appellant $70 for a television. Appellant signed the pawn ticket and the entire transaction was captured on the store security cameras.

---

[1] The indictments for Ms. Speck do not appear in the record on appeal. During Appellant's trial, it was disclosed that Ms. Speck pled guilty to second degree murder and aggravated robbery in exchange for a thirty-year sentence, to be served at 100%.

The victim's ATM card was used at 5:51 p.m. on January 8. A balance inquiry was made, showing that the account had a balance of a little over $160. Then a withdrawal was made for $160. The security tape showed Ms. Speck driving the car at the bank and using the ATM card to inquire about the balance and make the withdrawal from the account.

On the evening of January 8, Jack Huffman, Jr., was visited by Appellant and Ms. Speck. Mr. Huffman sold "synthetic heroin, Dilaudid."[2] Mr. Huffman often sold pills to Ms. Speck and occasionally sold them to Appellant. Appellant and Ms. Speck arrived in a reddish, burgundy-looking station wagon and wanted to trade the car and a television for pills. Mr. Huffman explained to them that he was "in the business of selling drugs, not taking stolen property" and that he did not want to fool with the car or television. Appellant told him that he got the car from the "old lady next door." Appellant told them he was going to say that the car was stolen at the mall or something but Mr. Huffman told Appellant and Ms. Speck that he did not need the car.

Testimony from the victim's son, Christopher J. Smith, confirmed that the victim drove a red Subaru station wagon and that this was the station wagon shown in both the videotape from the pawn shop and on the bank's ATM camera. Additionally, footage from Wal-Mart showed the victim buying a television that contained the same serial number as the television that Appellant took to the pawn shop for money on January 8. Mr. Smith also identified a "double-headed ax" that his dad used to own. He was fairly certain that he had seen the ax at his mother's house prior to her death.

Early on the morning on January 9, 2010, Mr. Harp went outside and saw that the victim's trailer was on fire. The fire department and other authorities were already on the scene. Mr. Harp walked toward the fire. There, he saw Appellant, who walked up and "acted like he was concerned." Appellant "went missing" shortly after this brief conversation. Mr. Harp just assumed that Appellant went back to his trailer.

The victim's body was found amidst the ashes in the fire. The body was lying face-down. A portion of the back of the victim's skull was missing and there were puncture wounds on the front of the body. A canine alerted to the presence of accelerant in the fire debris around the victim's body and on the body itself.

Ms. Speck was the State's star witness. She testified that she pled guilty to second degree murder and aggravated robbery in exchange for a sentence of thirty years, to be served at 100 percent. Ms. Speck testified that she met Appellant in 2008 when she bought Dilaudid from him to support her drug addiction. Soon thereafter, they became a couple and Ms.

---

[2] At the time of his testimony, Mr. Huffman was serving a seven-year sentence for a drug conviction.

Speck left her husband and moved in with Appellant. The couple were able to support their drug habit with a combination of money earned from Appellant's drug sales and from stealing merchandise from retail stores. The pair would steal items and return them in exchange for gift cards. Then they would pawn the gift cards for pennies on the dollar. Ms. Speck explained that both she and Appellant were injecting pills every few hours. She claimed that she could not stop taking drugs because she would get "really, really sick."

In late 2009, Ms. Speck and Appellant lived next door to the victim. Ms. Speck considered the victim her friend, explaining that she could count on the victim to help her out when she needed help. For example, when the pipes froze in her trailer, Ms. Speck made daily trips to the victim's trailer to get water.

Two days prior to the fire at the victim's trailer, Ms. Speck and the victim got into a fight. Ms. Speck called a cab and went to visit Mr. Huffman. While at Mr. Huffman's house, Ms. Speck got a call from her neighbor, Mr. Harp's, phone. She did not answer the phone because she "knew it was [Appellant]" because "he had been texting [her] prior that day and ran out of minutes on his cell phone."

Ms. Speck eventually took a cab back to the trailer. When she got back, she and Appellant talked about the phone call from Mr. Harp's residence. Ms. Speck testified that Appellant told her he was going to Mr. Harp's house to "kill them" for money and "steal their TV." Appellant claimed that he did not follow through with his plan because Mr. Harp had company at the time.

Appellant then instructed Ms. Speck to go over to the victim's house with an empty water jug and act as a "lookout . . . stand by the window and look out to make sure nobody would come." Ms. Speck did as instructed, walking over to the victim's house and asking to use the telephone. As she sat down to use the phone, Appellant knocked on the victim's door. The victim let Appellant in and "as she turned her back, [Appellant] stabbed her in the neck . . . with a screwdriver." Ms. Speck knew what Appellant was planning on doing but she did not warn the victim because she was afraid of Appellant.

Ms. Speck saw Appellant stab the victim multiple times in the back with two different knives, one of which he took from the victim's kitchen. According to Ms. Speck, as Appellant was stabbing the victim, she said, "I'll pray for you" and, "Ow, it hurts." The victim "went down . . . [and] laid there, and you could hear her gasping for air, and she was laying in her blood." Appellant found a hatchet in one of the bedrooms, "got it and went back in, . . . and he hit her on the back of the head a couple of times, and then she was - she quit breathing after that."

Ms. Speck and Appellant searched the house, taking $80 in cash from the victim's wallet, the victim's car keys, and a small television. Ms. Speck drove the victim's car to Bud's Pawn Shop, where Ms. Speck exchanged a gift card for cash. The couple then drove to a "pill dealer" to buy more pills. After getting more pills they stopped by Mr. Huffman's house and offered to sell him the car and television. Mr. Huffman did not want the items.

After leaving Mr. Huffman's house, they drove to a bridge, where Appellant stopped and threw the weapons, a screwdriver, two knives, and a hatchet into the water wrapped in a kitchen towel.

At this point, Ms. Speck and Appellant went back to the victim's house to look for the box for the television so that they could sell it for more money. They found both the box and the receipt but realized that they could not return it to Wal-Mart because the victim had purchased the television with a credit card. During their search, they also located the PIN code for the victim's ATM card on a bank statement.

Ms. Speck and Appellant left the home of the victim for the second time, returning to Bud's Pawn Shop, where Appellant sold the television. The couple then drove to the ATM where they checked the balance and withdrew $160 from the account. They used the money to buy more pills.

When Appellant and Ms. Speck got back home, they "did some more pills" and went to bed. Ms. Speck awoke the next morning when Appellant slammed the door. He informed her that he "took care of everything." When Ms. Speck asked what that meant, Appellant "opened the back door and there [were] huge flames shooting through the roof of [the victim's] house." Appellant told Ms. Speck that he called 911.

Ms. Speck went back to sleep. She was awakened by a text message from a "Mr. Miller." When she opened the back door, the "SWAT team [was] all around [her] house." She recalled that they arrested Appellant on an outstanding warrant.

Ms. Speck recalled being interviewed at least three times by TBI agents over the months that followed the murder and fire. She acknowledged that she did not "tell the whole truth." She explained that she was afraid of Appellant because he had been abusive in the past. Ms. Speck testified that she finally started telling the truth when she was assured that Appellant would not be getting out of jail. Ms. Speck was asked if she was partially responsible for the victim's death. She explained her role as the "gate-way key" and claimed that Appellant "wouldn't have had access if I wouldn't have [gone] in [to the victim's house]."

The State introduced forensic evidence that the boots worn by Appellant at the time of his arrest contained a blood spot that matched the DNA profile of the victim. Additionally, two knives and a hatchet were recovered from beneath a bridge leading into the East Lake Subdivision near Cookeville. The medical examiner explained the cause of death of the victim was "multiple modality trauma" as the result of a homicide. The victim suffered at least three, non-fatal stab wounds to the chest, and six stab wounds to the back, including a wound three inches deep that injured the spinal cord. There were also neck injuries of the type seen in strangulation cases.

At the conclusion of the jury trial, the jury convicted Appellant of one count of first degree murder, one count of felony murder, one count of aggravated robbery, one count of arson, and one count of tampering with evidence. The trial court merged the first degree murder conviction with the felony murder conviction and imposed a life sentence. Appellant was also ordered to serve twelve years for the aggravated robbery conviction, six years for the arson conviction, and six years for the tampering with evidence conviction. The trial court ordered the arson and tampering with the evidence convictions to be served concurrently with each other but consecutively to the life sentence and sentence for aggravated robbery, for a total effective sentence of life imprisonment plus eighteen years. After the denial of a motion for new trial, Appellant initiated this appeal. On appeal, the following issues are presented for our review: (1) whether the trial court erred by denying a change of venue; (2) whether the trial court erred by denying Appellant's motion to suppress; (3) whether the evidence was insufficient to support the convictions; and (4) whether the trial court erred by admitting certain items of evidence.

*Denial of Change of Venue*

Appellant insists that the trial court erred by denying a change of venue. Specifically, Appellant insists that there was a great deal of pretrial publicity of the murder and arson that "permeated the area from which the venire [was] drawn" such that the trial court should have granted a change of venue. The State disagrees, arguing that the transcript of the jury selection does not reveal that the jury pool was prejudiced by any pretrial publicity.

A change of venue may be granted "when a fair trial is unlikely because of undue excitement against the defendant in the county where the offense was committed or for any other cause." Tenn. R. Crim. P. 21(a). A motion for change of venue is left to the sound discretion of the trial court, and the court's ruling will be reversed on appeal only upon a clear showing of an abuse of that discretion. *State v. Howell*, 868 S.W.2d 238, 249 (Tenn. 1993); *State v. Hoover*, 594 S.W.2d 743, 746 (Tenn. Crim. App. 1979). The mere fact that jurors have been exposed to pretrial publicity will not warrant a change of venue. *State v. Mann*, 959 S.W.2d 503, 531-32 (Tenn. 1997). Similarly, prejudice will not be presumed on

the mere showing of extensive pretrial publicity. *State v. Stapleton*, 638 S.W.2d 850, 856 (Tenn. Crim. App. 1982). In fact, jurors may possess knowledge of the facts of the case and may still be qualified to serve on the panel. *State v. Bates*, 804 S.W.2d 868, 877 (Tenn. 1991). Before a conviction will be overturned on a venue issue, the appellant must demonstrate on appeal that the jurors were biased or prejudiced against him. *State v. Melson*, 638 S.W.2d 342, 360-61 (Tenn. 1982). The test is whether the jurors who actually sat on the panel and rendered the verdict and sentence were prejudiced. *State v. Kyger*, 787 S.W.2d 13, 18-19 (Tenn. Crim. App. 1989). This Court has quoted the United States Supreme Court and stated the following:

> "[E]xtensive knowledge in the community of either the crimes or the putative criminal is not sufficient by itself to render a trial unconstitutionally unfair," and the court may not presume unfairness based solely upon the quantity of publicity "in the absence of a 'trial atmosphere . . . utterly corrupted by press coverage.'"

*State v. Crenshaw*, 64 S.W.3d 374, 387 (Tenn. Crim. App. 2001) (quoting *Dobbert v. Florida*, 432 U.S. 282, 303 (1977) (quoting *Murphy v. Florida*, 432 U.S. 282, 303 (1975))). The burden of proof is on the defendant to show that the jurors were biased or prejudiced against him. *Id.* at 394; *see also State v. Blackwell*, 664 S.W.2d 686, 689 (Tenn. 1984); *State v. Garland*, 617 S.W.2d 176, 187 (Tenn. Crim. App. 1981).

> We have also stated:

> Furthermore, the scope and extent of voir dire is left to the sound discretion of the trial court. *State v. Smith*, 993 S.W.2d 6, 28 (Tenn. 1999). Jurors who have been exposed to pretrial publicity may sit on the panel if they can demonstrate to the trial court that they can put aside what they have heard and decide the case on the evidence presented at trial. *State v. Gray*, 960 S.W.2d 598, 608 (Tenn. Crim. App. 1997).

*State v. William Glenn Rogers*, No. M2002-01798-CCA-R3-DD, 2004 WL 1462649, at *19 (Tenn. Crim. App., at Nashville, Jun. 30, 2004), *reh'g denied*, (Tenn., Aug. 27, 2004).

Relevant factors to consider in determining whether to grant a motion for a change of venue include: (1) nature, extent, and timing of pre-trial publicity; (2) nature of publicity as fair or inflammatory; (3) the particular content of the publicity; (4) the degree to which the publicity complained of has permeated the area from which the venire is drawn; (5) the degree to which the publicity circulated outside the area from which the venire is drawn; (6) the time elapsed from the release of the publicity until the trial; (7) the degree of care

exercised in the selection of the jury; (8) the ease or difficulty in selecting the jury; (9) the veniremen's familiarity with the publicity and its effect, if any, upon them as shown through their answers on voir dire; (10) the defendant's utilization of his peremptory challenges; (11) the defendant's utilization of his challenges for cause; (12) the participation by police or by prosecution in the release of publicity; (13) the severity of the offense charged; (14) the absence or presence of threats, demonstrations or other hostility against the defendant; (15) size of the area from which the venire is drawn; (16) affidavits, hearsay, or opinion testimony of witnesses; (17) nature of the verdict returned by the trial jury. *Hoover*, 594 S.W.2d at 746.

Again, jurors may sit on a case even if they have formed an opinion assuming the trial court is satisfied that the juror is able to set aside the opinion and render a verdict based upon the evidence presented in court. *State v. Brown*, 836 S.W.2d 530, 549 (Tenn. 1992). Moreover, for there to be a reversal of a conviction based upon a claim that the trial court improperly denied a motion for a change of venue, the "defendant must demonstrate that the jurors who actually sat were biased or prejudiced against him." *State v. Evans*, 838 S.W.2d 185, 192 (Tenn. 1992) (citing *State v. Burton*, 751 S.W.2d 440, 451 (Tenn. Crim. App. 1988)).

In the case herein, Appellant argues that several news stories in the Cookeville *Herald-Citizen* newspaper and the existence of an internet discussion about the killing tainted the jury pool in Putnam County. At a pretrial hearing on the motion, the trial court noted that there were some "bad things said maybe about the accused" on a Topix website and four articles on the local paper. The trial court did not think that these articles or information on the website "would prevent the accused from getting a fair trial" but admitted that the website was something to "ask" potential jurors about during voir dire. In other words, the trial court denied the motion for a change of venue but told Appellant to renew the motion during jury selection if it was warranted.

Appellant did not present any evidence either during jury selection or on appeal to show what portion of the jury pool was exposed to the articles or the internet information. The record of the voir dire reflects that the potential jurors were extensively questioned about their knowledge of the case. Most stated that they had no knowledge of the crime. A few potential jurors recalled reading something about the case in the newspaper but insisted that they could remain objective. There was not one juror who believed that his ability to be fair and impartial was affected by something he had either heard or seen about the crime prior to trial. Appellant has not shown that the pretrial publicity resulted in a jury pool that was prejudiced against him. This issue is without merit.

*Denial of Motion to Suppress*

Appellant argues that the trial court erred by not suppressing the evidence obtained as a result of the search warrants and consent waiver. Specifically, Appellant insists that the search warrants were procured solely on the information supplied by his co-defendant, Ms. Speck and that the consent waiver signed by Appellant had expired by the time Appellant's shoes were seized. In other words, Appellant argues that the information set out in the affidavit does not meet the two prong test set out in *Spinelli v. United States*, 393 U.S. 410 (1969) and *Aguilar v. Texas*, 378 U.S. 108 (1964) ("*Aguilar-Spinelli* "), as adopted in *State v. Jacumin*, 778 S.W.2d 430, 437 (Tenn. 1989), concerning the proof of the reliability of a confidential informant. The State contends that the information given to police by Ms. Speck was reliable, thereby validating the search warrant. Furthermore, the State insists that Appellant's consent did not expire prior to the seizure of his boots.

*A. Validity of Search Warrant*

"This Court will uphold a trial court's findings of fact in a suppression hearing unless the evidence preponderates otherwise." *State v. Hayes*, 188 S.W.3d 505, 510 (Tenn. 2006) (citing *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). On appeal, "[t]he prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. Our review of a trial court's application of law to the facts is de novo, with no presumption of correctness. *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001) (citing *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999); *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997)). When the trial court's findings of fact are based entirely on evidence that does not involve issues of witness credibility, however, appellate courts are as capable as trial courts of reviewing the evidence and drawing conclusions, and the trial court's findings of fact are subject to de novo review. *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000). Further, we note that "in evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial." *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998).

An affidavit establishing probable cause is an indispensable prerequisite to the issuance of a search warrant. *See, e.g.*, T.C.A. § 40-6-103; Tenn. R. Crim. P. 41(c); *State v. Henning*, 975 S.W.2d 290, 294 (Tenn. 1998); *State v. Moon*, 841 S.W.2d 336, 338 (Tenn. Crim. App. 1992). Such probable cause "must appear in the affidavit [itself] and judicial review of the existence of probable cause will not include looking to other evidence provided

-10-

to or known by the issuing magistrate or possessed by the affiant." *Moon*, 841 S.W.2d at 338; *see also Henning*, 975 S.W.2d at 295. To sufficiently make a showing of probable cause, an affidavit "must set forth facts from which a reasonable conclusion might be drawn that the evidence is in the place to be searched." *State v. Smith*, 868 S.W.2d 561, 572 (Tenn. 1993). However, a decision regarding the existence of probable cause requires that the affidavit contain "more than mere conclusory allegations by the affiant." *State v. Stevens*, 989 S.W.2d 290, 293 (Tenn. 1999); *see also Moon*, 841 S.W.2d at 338.

When an affidavit is based upon information given to the police as affiant, the court must determine what category into which the informant falls in order to apply the appropriate assessment of reliability. Our supreme court recently addressed the issue of the "citizen informant" as opposed to an informant from the "criminal milieu." *State v. Echols*, 382 S.W.3d 266, 279 (Tenn. 2012). If an informant is considered an ordinary citizen, they are a "citizen informant." When a citizen informant is used for probable cause to procure a warrant, "no showing of the informant's basis of knowledge or veracity is required." *Id.* However, if an informant is from the criminal milieu, "'[the officers] must be able to demonstrate that the informant (1) has a basis of knowledge and (2) is credible or his information is reliable.'" *Id.* (quoting *State v. Lewis*, 36 S.W.3d 88, 98 (Tenn. Crim. App. 2000)).

Our first inquiry must be whether Ms. Speck is a citizen informant or part of the criminal milieu. With regard to a citizen informant, it has been stated that eyewitnesses, or citizen informants, "'are seldom involved with the miscreants or the crime. Eyewitnesses by definition are not passing long idle rumor, for they have either been the victims of the crime or have otherwise seen some portion of it.'" *State v. Melson*, 638 S.W.2d 342, 344(Tenn. 1982) (quoting *United States v. Bell*, 457 F.2d 1231, 1238-39 (5th Cir. 1972). An informant from the criminal milieu, on the other hand, "are intimately involved with the persons informed upon and with the illegal conduct at hand, and this circumstance could also affect their credibility.'" *Id.* (quoting *Bell*, 457 F.2d at 1238-39). Under these definitions, it is clear that Ms. Speck would be considered an informant from the criminal milieu. Therefore, her statements cannot be considered inherently reliable.

Therefore, we must turn to the two prong test known as the *Aguilar-Spinelli* test. As stated above, if an informant is from the criminal milieu, "'[the officers] must be able to demonstrate that the informant (1) has a basis of knowledge and (2) is credible or his information is reliable.'" *Id.* (quoting *State v. Lewis*, 36 S.W.3d 88, 98 (Tenn. Crim. App. 2000)); *see also State v. Jacumin*, 778 S.W.2d 430, 436 (Tenn. 1989) (utilizing the standard

-11-

set out in *Spinelli* and *Aguilar*).[3]  To sufficiently make such showings, the affidavit must include facts permitting "the magistrate to determine: (1) whether the informant had a basis for his information that a certain person had been, was, or would be involved in criminal conduct or that evidence of crime would be found at a certain place" and (2) whether the informant is inherently credible or "the reliability of his information on the particular occasion." *Moon*, 841 S.W.2d at 338.  Again, the courts have stressed that conclusory statements absent supportive detail will not suffice to establish these requirements. *See, e.g.*, *id.* at 339.  However, "independent police corroboration" may compensate for such deficiencies. *See Jacumin*, 778 S.W.2d at 436; *Moon*, 841 S.W.2d at 340.

Case law warns against a hyper-technical application of the *Aguilar-Spinelli* test, and this Court has previously provided that "[t]he requisite volume or detail of information needed to establish the informant's credibility is not particularly great." *State v. Lowe*, 949 S.W.2d 302, 305 (Tenn. Crim. App. 1996).  However, precedent also provides that "the affiant must provide some concrete reason why the magistrate should believe the informant." *Id.*  In cases where the information comes from a criminal informant, as in the case at hand, the affiant must show not only the basis of the informant's knowledge but they must also establish that the informant is credible or the information given is reliable. *See Jacumin*, 778 S.W.2d at 436.

In *Jacumin*, the court explained that the basis-of-knowledge prong requires the affidavit to contain facts from which the magistrate can determine that the informant had a basis for the claim regarding criminal conduct or contraband. *Id.* at 432.  The veracity prong, on the other hand, requires the affidavit to contain facts from which the magistrate can determine either: (1) the inherent credibility of the informant; or (2) the reliability of the information provided. *Id.*  In order to make up for deficiencies in either prong, independent police corroboration of the information provided by the informant will suffice. *State v. Powell*, 53 S.W.3d 258, 263 (Tenn. Crim. App. 2000).

In order to demonstrate that the informant is reliable, the "criminal activity [must be described by the informant] in sufficient detail that the magistrate may know that he [or she] is relying on something more substantial than a casual rumor circulating in the underworld

---

[3] In *Illinois v. Gates*, 462 U.S. 213 (1983), the United States Supreme Court abandoned the *Aguilar-Spinelli* two-pronged test for evaluating the sufficiency of an affidavit involving a confidential informant. *Gates*, 462 U.S. at 238.  However, the Tennessee Supreme Court subsequently concluded that *Aguilar-Spinelli* "properly applied 'provide[s] a more appropriate structure for probable cause inquiries incident to the issuance of a search warrant . . . [and] is more in keeping with the specific requirement of Article 1, Section 7 of the Tennessee Constitution that a search warrant not issue 'without evidence of the fact committed.'" *Jacumin*, 778 S.W.2d at 436.

or an accusation based merely on an individual's general reputation." *Spinelli*, 390 U.S. at 416.

In the case herein, at the hearing on the motion to suppress prior to trial, Appellant argued that Ms. Speck's untruthfulness to the authorities led to the failure of the veracity prong of the *Aguillar-Spinelli* test and, as a result, the search warrant was invalid. The trial court determined as follows:

> The fact that Ms. Speck had given false information, and there's not a whole lot in the warrant to verify her veracity, certainly she's not a citizen informant, in the sense of an uninterested person, but the information that she gave is reasonably reliable based on the circumstances. And it seems to me that she alleged to have been aware of the knife and screwdriver, or something like that, and the fact that the victim had been stabbed . . . I mean, [the authorities] knew that no one else knew that, the public didn't know that, but Ms. Speck seemed to know that [fact]. And I think that the information she gave is reliable. The circumstances surrounding the information she gave, and how she knew it, and all that came to be, certainly would give some validity to the warrant itself. So I think the consent is good, the search warrant is good.

We agree with the assessment of the trial court. The affidavit submitted with the search warrant was prepared by Agent Miller and recounted his investigation of the crime, including several of his interviews with Ms. Speck. The information provided therein established the basis for Ms. Speck's knowledge. This prong is clearly met because Ms. Speck had personal knowledge of the crime. An informant's personal knowledge of criminal activity by the defendant has been previously held to be adequate to meet the "basis of knowledge" requirement. *See State v. Smotherman*, 201 S.W.3d 657, 664 (Tenn. 2006)**.** Furthermore, the information provided by Ms. Speck also established the reliability prong because she was able to provide information not known by the general public but which had been discovered by authorities in the course of their investigation. In addition, her statements were made against her own penal interest and subjected her to possible criminal prosecution and would therefore be presumably reliable. Therefore, the affidavit provided sufficient probable cause for the issuance of the warrant. The trial court did not abuse its discretion in denying the motion to suppress the search warrant. Appellant is not entitled to relief on this issue.

*B. Search of Boots*

Appellant also argues that the consent to search form that was signed after his arrest on outstanding warrants had somehow expired prior to the time the authorities examined his boots at the jail approximately two weeks later. Appellant signed a consent form at the time of his arrest that permitted authorities to "take from my premises" items that "include[d] clothing or evidence pertaining to the death of [the victim]," and "evidence from the body of my person."

After reviewing the issue herein at a pretrial hearing, the trial court found:

[Appellant], at least is alleged to have signed, and no dispute about it, a consent form on the 10th [of January] to seize clothing. The fact that it was some . . . 16 days later, and the fact that it was in the custody of the sheriff and the inventory property room, it seems to me does not invalidate the consent. That delay of time is not a factor.

On the 10th, [Appellant] signed a consent form. The fact that the boots were in the jail's custody, as opposed to being on the premises, it seems to me, that doesn't invalidate the warrant. So I think the consent is good for seizure of the boots to do to the test.

We do not need to reach the question of whether the consent to search had expired. It has long been held that a search of clothing in the possession of law enforcement as a result of a defendant's arrest is an exception to the warrant requirement. The United States Supreme Court has stated the following:

[T]he effects in [Appellant's] possession [after his lawful arrest] at the place of his detention that were subject to search at the time and place of his arrest may lawfully be searched and seized without a warrant even though a substantial period of time has elapsed between the arrest and subsequent administrative processing, on the one hand, and the taking of the property for use as evidence, on the other.

*United States v. Edwards*, 415 U.S. 800, 807 (1974); *see also State v. William T. Minton*, No. E2010-01156-CCA-R3-CD, 2011 WL 3860492, at *10 (Tenn. Crim. App., at Knoxville, Sept. 1, 2011), *perm. app. denied*, (Tenn. Dec. 14, 2011); *State v. Pender*, 687 S.W.2d 714,

-14-

719 (Tenn. Crim. App. 1984), *perm. app. denied*, (Tenn. 1985); *State v. Barger*, 612 S.W.2d 485, 491 (Tenn. Crim. App. 1980), perm. app. denied, (Tenn. 1981).

In the case at hand, Appellant was actually arrested on unrelated charges. An issue not raised by either party is whether Appellant's boots could be searched in connection with the murder when he was actually arrested on different charges. There appears to be no law directly on point in Tennessee. However, one learned treatise states the following:

> [P]ermitting a detailed post-booking search through the arrestee's effects to see if he can be linked with some other offense bestows upon the police an undeserved windfall and provides them with a temptation to make subterfuge arrests. . . .On the other hand, if a defendant is in custody for offense *A* and there later develops probable cause to arrest him for offense *B*, it might well be concluded that a re-examination of all his property held by the police and subject to search at the time of his original arrest, to see if any of it is or contains evidence of offense *B*, is justified, as otherwise the defendant would receive greater protection than had he not been in custody and was just now being arrested for offense *B*.

Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment, §5.3(b) (5th ed. 2012).

The facts here are that Appellant and Ms. Speck were arrested on unrelated charges. Ms. Speck subsequently gave a statement to police implicating Appellant in the victim's murder. After this statement, we believe the officers had probable cause to arrest Appellant for the victim's murder had he not already been in custody. The officers then obtained Appellant's boots where they were being stored while Appellant was in custody.

Because Appellant there was probable cause to arrest Appellant for the murder before the boots were tested, we conclude that the search was properly conducted without a warrant under *United States v. Edwards*, 415 U.S. 800 (1974)

Appellant is not entitled to relief on this issue.

*Evidentiary Rulings*

Next, Appellant makes several claims with respect to evidence that was admitted during the course of the trial. The Tennessee Rules of Evidence embody, and our courts

traditionally have acknowledged, "a policy of liberality in the admission of evidence in both civil and criminal cases . . . ." *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978); *see also State v. Robinson*, 930 S.W.2d 78, 84 (Tenn. Crim. App. 1995). To be admissible, evidence must satisfy the threshold determination of relevancy mandated by Rule 401 of the Tennessee Rules of Evidence. *See, e.g., Banks*, 564 S.W.2d at 949. Rule 401 defines "relevant evidence" as being "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." Tenn. R. Evid. 403; *see also Banks*, 564 S.W.2d at 951.

### A. Evidence of Drug Use, Domestic Violence, and Behavior at Mr. Harp's House

First Appellant complains that the trial court improperly allowed the State to inject testimony about his drug use and history of abusive behavior and that the evidence was improperly admitted. Appellant also objects to Mr. Harp's testimony regarding his perception of Appellant. Specifically, Appellant argues that the evidence was unfairly prejudicial and should not have been admitted under Tennessee Rule of Evidence 404(b).

The general rule is that evidence of a defendant's prior conduct is inadmissible, especially when previous crimes or acts are of the same character as the charged offense, because such evidence is irrelevant and "invites the finder of fact to infer guilt from propensity." *State v. Hallock*, 875 S.W.2d 285, 290 (Tenn. Crim. App. 1993). Tennessee Rule of Evidence 404(b) permits the admission of evidence of prior conduct if the evidence of other acts is relevant to a litigated issue such as identity, intent, or rebuttal of accident or mistake, and the probative value outweighs the danger of unfair prejudice. Tenn. R. Evid. 404(b), Advisory Comm'n Cmts.; *see State v. Parton*, 694 S.W.2d 299, 303 (Tenn. 1985); *State v. Hooten*, 735 S.W.2d 823, 824 (Tenn. Crim. App. 1987). The motive and intent of the defendant in the commission of a murder are almost always critical issues. *State v. Gentry*, 881 S.W.2d 1, 7 (Tenn. Crim. App. 1993). Evidence that proves motive serves the purpose of completing the story of the crime. *State v. Leach*, 148 S.W.2d 42, 47 (Tenn. 2004). However, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). Before admitting evidence under Rule 404(b), the rule provides that (1) upon request, the court must hold a hearing outside the jury's presence; (2) the court must determine that the evidence is probative on a material issue and must, if requested, state on the record the material issue and the reasons for admitting or excluding the evidence; (3) the court must find proof of the other crime, wrong, or act to be clear and convincing; and (4) the court must exclude the evidence if the danger of unfair prejudice outweighs its probative value. Tenn. R. Evid. 404(b).

Appellant sought to limit the introduction of evidence related to his drug use and prior alleged domestic violence acts toward Ms. Speck on the basis that it was overly prejudicial. The trial court held a hearing at which Mr. Harp, Ms. Speck, and Agent Miller testified. At the hearing, the trial court determined that testimony regarding the drug use, drug sales, thefts, illicit lifestyle, and volatility of both Appellant and Ms. Speck were admissible in order to "show a complete picture of what went on here leading up to showing intent in committing the crime." At trial the State relied on a theory that the motive for the robbery and murder was to obtain money to buy more drugs.

The record demonstrates that the trial court met the requirements under Rule 404(b) before determining that the testimony was admissible. Our determination on appeal is, therefore, limited to a determination of whether the trial court abused its discretion in admitting the testimony. The proof showed that Appellant and Ms. Speck robbed and killed the victim, taking her television, money, and ATM card. Then the pair went directly to a dealer and bought more pills. Thus, the testimony regarding Appellant's pattern of drug use and past drug sales was relevant and probably critical to the development of motive by the State. The trial court did not abuse its discretion in admitting this testimony. Further, Ms. Speck's testimony about her fear of Appellant due to his previous abusive behavior was important to explain her hesitancy to tell the truth about the murder. The admission of her testimony was also relevant to assist the trier of fact in the determination of the credibility of her testimony, which was certainly at issue. The trial court properly determined that this evidence was more probative than prejudicial. Finally, Mr. Harp's testimony about Appellant's "odd" behavior when he asked to use the telephone was properly admitted. Mr. Harp testified that Appellant used the phone at his house and hung up after no one answered. Mr. Harp described Appellant's behavior as odd. Ms. Speck later testified that she received a call from a phone number she recognized as Mr. Harp's on her cell phone at a time when Appellant was angry with her for something. Ms. Speck later testified that Appellant had planned to kill the Harps and steal their television.[4] The trial court did not abuse its discretion in admitting Mr. Harp's testimony. Appellant is not entitled to relief on this issue.

### B.  Dying Declaration of the Victim

Next, Appellant argues that the trial court improperly admitted the statements made by the victim at the time of the murder. Appellant argues that these statements were not admissible because Ms. Speck had demonstrated her proclivity by providing less than truthful

---

[4]Appellant does not challenge the admission of this testimony on appeal.

information to authorities and the statements were more prejudicial than probative.[5] The State argues that the statements were admissible as dying declarations and or excited utterances.

In the case herein, prior to the testimony of Ms. Speck, Appellant asked the trial court to exclude any and all statements made by the victim. Counsel for Appellant indicated that a written motion had been filed to that effect. The trial court held a jury-out hearing during the trial to determine whether to grant or deny Appellant's motion. In denying the motion, the trial court ruled that the statements were admissible under the dying declaration exception in Tennessee Evidence Rule 804(b)(2) and/or as an excited utterance under Rule 803(2). Then, Ms. Speck testified to two statements made by the victim as follows:

> COUNSEL FOR STATE: What did [the victim say]?
> MS. SPECK: "I'll pray for you."
> COUNSEL FOR STATE: As he's stabbing her?
> MS. SPECK: Yes. She was saying a prayer for him.
> COUNSEL FOR STATE: What else did she say?
> MS. SPECK: I don't - I mean, "Ow, it hurts."

We will first address the admission of the statements as hearsay. Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Tenn. R. Evid. 801. Hearsay statements, in general, are inadmissible. In the case at hand, we conclude that the statements in question do not constitute hearsay. These statements were not offered to prove the truth of the matter asserted. In other words, the State did not submit the statements to prove that the victim was praying for Appellant or that the wounds inflicted upon the victim hurt her. Therefore, the proper analysis for the admission of these statements is not whether they fall under a hearsay exception, but whether they are more probative than they are prejudicial.

As stated above, Rule 401 of the Tennessee Rules of Evidence defines "relevant evidence" as being "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." Tenn. R. Evid. 403; *see also Banks*, 564 S.W.2d at 951.

---

[5]We note that Appellant cites to Tennessee Rule of Evidence 404(b) in his argument that the statements were improperly admitted. We discern that Appellant intended to raise this claim under Rule 403, as the evidence complained of does not involve other crimes, wrongs, or acts of the Appellant.

The two statements in question do not have a tendency to make it more likely that a jury would determine that Appellant committed the crimes at hand. Ms. Speck had already testified extensively about her involvement and the actions of Appellant. The statements were simply not necessary. The statements in question were more prejudicial than probative because they were cumulative. Therefore, the trial court erred in admitting the statements under a hearsay exception.

However, we conclude that the error is harmless. The other evidence presented was overwhelming with regard to Appellant's guilt. Therefore, Appellant is not entitled to relief on this issue.

## C. *Photograph of the Victim's Body*

Appellant argues that the trial court improperly admitted a photograph of the victim's body. Specifically, he complains that the victim's body is "beyond recognition" and was inflammatory and prejudicial. The State disagrees.

As stated previously, only relevant evidence is admissible. *See, e.g., Banks*, 564 S.W.2d at 949. Again, Rule 401 defines "relevant evidence" as being "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." Tenn. R. Evid. 403; *see also Banks*, 564 S.W.2d at 951.

Graphic, gruesome, or even horrifying photographs of crime victims may be admitted into evidence if they are relevant to some issues at trial and probative value is not outweighed by their prejudicial effect. *Banks*, 564 S.W.2d at 949-51. On the other hand, "if they are not relevant to prove some part of the prosecution's case, they may not be admitted solely to inflame the jury and prejudice them against the defendant." *Id.* at 951 (citing *Milam v. Commonwealth*, 275 S.W.2d 921 (Ky. 1955)). The decision as to whether such photographs should be admitted is entrusted to the trial court, and that decision will not be reversed on appeal absent a showing of abuse of discretion. *Id.* at 949; *State v. Dickerson*, 885 S.W.2d 90, 92 (Tenn. Crim. App. 1993).

The term "undue prejudice" has been defined as "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" *Banks*, 564 S.W.2d at 951 (quoting Fed. R. Evid. 403, Advisory Comm'n Cmts.). In *Banks*, the Supreme Court gave the trial courts guidance for determining the admissibility of relevant photographic evidence and determined that a trial court should consider, (1) the accuracy and

clarity of the picture and its value as evidence; (2) whether the picture depicts the body as it was found; (3) the adequacy of testimonial evidence in relating the facts to the jury; and (4) the need for the evidence to establish a prima facie case of guilt or to rebut the defendant's contentions. *Id.* at 951.

At trial, prior to the testimony of the arson expert and medical examiner, counsel for Appellant asked the trial court to exclude two photographs of the victim's body from the scene of the fire from evidence. While the jury was out of the courtroom, the State argued that the photographs depicting the victim's injuries were more probative than prejudicial. The trial court allowed one of the photographs into evidence. The trial court stated the following:

> Well, it is a matter of discretion of the Court. The allegation is that it would be probative in regards to corroborating testimony as to the injury. I believe one of these pictures can be admitted. I see no reason for both of them.

We agree with the trial court's decision. We have reviewed the photograph in question and have concluded that the trial court did not abuse its discretion. The photograph depicts the victim's body as it was found and shows the extent of the fire and the injuries suffered by the victim. The victim's face is not visible in the photograph, nor does there appear to be blood in the photograph. This is probably due to the extent of the burns on the victim's body. The photograph was relevant to prove the extent of the victim's injuries. Therefore, its probative value outweighs it prejudicial effect. Because we have determined that the trial court did not abuse its discretion, this issue is without merit.

*Sufficiency of the Evidence*

Finally, Appellant argues that the evidence was insufficient to support his convictions. Specifically, he takes issue with the testimony of co-defendant, Ms. Speck, and the murder weapon that was "found" by authorities. Appellant argues that the credibility of Ms. Speck's testimony was in question and the testimony of Mr. Harp was mere perception.

To begin our analysis, we note that when a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all conflicts in the testimony in favor of the State. *State v. Cazes*, 875 S.W.2d 253, 259 (Tenn. 1994); *State v. Harris,* 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally deemed with a presumption of innocence, the verdict of guilty removes this presumption and replaces it with one of guilt. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Tuggle*, 639 S.W.2d 913, 914

(Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. *Id*.

The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." *See Tuggle*, 639 S.W.2d at 914. As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence. *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 599, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proved, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *See State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. *See State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). As such, all reasonable inferences from evidence are to be drawn in favor of the State. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *See Tuggle*, 639 S.W.2d at 914.

Appellant herein was convicted of one count of first degree murder, one count of felony murder, one count of aggravated robbery, one count of arson, and one count of tampering with evidence. The trial court merged the felony murder conviction with the conviction for first degree murder.

First degree murder is described as "[a] premeditated and intentional killing of another; . . . ." T.C.A. § 39-13-202(a). Tennessee Code Annotated section 39-13-202(d) provides that:

> "[P]remeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused

at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

An intentional act requires that the person have the desire to engage in the conduct or cause the result. T.C.A. § 39-11-106(a)(18). Whether the evidence was sufficient depends entirely on whether the State was able to establish beyond a reasonable doubt the element of premeditation. *See State v. Sims*, 45 S.W.3d 1, 7 (Tenn. 2001); *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999). Whether premeditation is present is a question of fact for the jury, and it may be inferred from the circumstances surrounding the killing. *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006); *see also State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000); *State v. Pike*, 978 S.W.2d 904, 914 (Tenn. 1998).

Premeditation may be proved by circumstantial evidence. *See, e .g., State v. Brown*, 836 S.W.2d 530, 541-42 (Tenn.1992). Our supreme court has identified a number of circumstances from which the jury may infer premeditation: (1) the use of a deadly weapon upon an unarmed victim; (2) the particular cruelty of the killing; (3) the defendant's threats or declarations of intent to kill; (4) the defendant's procurement of a weapon; (5) any preparations to conceal the crime undertaken before the crime is committed; (6) destruction or secretion of evidence of the killing; and (7) a defendant's calmness immediately after the killing. *See State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997); *Pike*, 978 S.W.2d at 914-15. This list, however, is not exhaustive and serves only to demonstrate that premeditation may be established by any evidence from which the jury may infer that the killing was done "after the exercise of reflection and judgment." T.C.A. § 39-13-202(d); *see Pike*, 978 S.W.2d at 914-15; *Bland*, 958 S.W.2d at 660.

One learned treatise states that premeditation may be inferred from events that occur before and at the time of the killing:

Three categories of evidence are important for [the] purpose [of inferring premeditation]: (1) facts about how and what the defendant did prior to the actual killing which show he was engaged in activity directed toward the killing, that is, planning activity; (2) facts about the defendant's prior relationship and conduct with the victim from which motive may be inferred; and (3) facts about the nature of the killing from which it may be inferred that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a preconceived design.

2 Wayne R. LaFave, *Substantive Criminal Law* § 14.7(a) (2d ed. 2003).

Appellant was also convicted of aggravated robbery. Robbery is the "intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401(a). A robbery becomes aggravated either when the victim is seriously injured or when the defendant "display[s] . . . any article used . . . to lead the victim to reasonably believe it to be a deadly weapon." T.C.A. § 39-13-402(a).

Arson is defined in Tennessee Code Annotated section 39-13-303 as follows:

(a) A person commits arson who knowingly damages any personal property, land, or other property, except buildings or structures covered under § 39-14-301, by means of a fire or explosion:

(1) Without the consent of all persons who have a possessory or proprietary interest therein;

(2) With intent to destroy or damage any such property for any unlawful purpose.

Tampering with the evidence occurs the State establishes, beyond a reasonable doubt, that Appellant, knowing that an investigation or official proceeding was pending or in progress, altered, destroyed, or concealed any record, document, or thing with the intent to impair its verity, legibility, or availability as evidence in the investigation or official proceeding. T.C.A. § 39-16-503(a)(1).

Viewing the evidence in a light most favorable to the State, we find the evidence sufficient to support the convictions. Appellant's challenge to the evidence is nothing more than a challenge to the credibility of the witnesses. This is in the province of the jury. Moreover, there was sufficient evidence, both direct and circumstantial, to satisfy the threshold of guilt. Ms. Speck testified as to Appellant's role in the murder. Appellant was seen in the victim's car, pawning her television after her death and the murder weapons were recovered in a lake nearby. Moreover, the victim's blood was on Appellant's boots. The jury was presented with ample evidence with which to convict Appellant of the crimes. Appellant is not entitled to relief on this issue.

*Conclusion*

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
JERRY L. SMITH, JUDGE

-23-